AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT FILED

for the

Northern District of California

SEP - 4 2019

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

*JCS*

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Advent Care Inc., | ) | Case No. |
| | ) | |
| | ) | **3  19  71459** |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ February 2, 2018 _____ in the county of _____ San Francisco _____ in the

_____ Northern _____ District of _____ California _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 42 U.S.C. § 1320a-7b(b) | Criminal penalties for acts involving Federal health care "Anti-Kickback Statute." |

**UNDER SEAL**

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

Approved as to form:

_____

WILLIAM FRENTZEN
Assistant United States Attorney

Sworn to before me and signed in my presence.

Date: ___ 9/4/19 ___

City and state: _____ San Francisco, California _____

_____
*Complainant's signature*

Katelyn McKendrick, Special Agent - FBI
*Printed name and title*

_____
*Judge's signature*

Hon. Joseph C. Spero, U.S. Chief Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Katelyn McKendrick, Special Agent with the Federal Bureau of Investigation ("FBI") being duly sworn, hereby depose and state as follows:

## I.  INTRODUCTION

### A.  SYNOPSIS

1.  I submit this affidavit in support of a criminal Complaint for RIDHIMA "AMANDA" SINGH (hereafter "SINGH") and her company Advent Care, Inc. ("ADVENT").  SINGH is the Chief Executive Officer of ADVENT.

2.  There is probable cause to believe SINGH, acting through and on behalf of her company, ADVENT, has engaged in paying kickbacks to doctors and other medical professionals in exchange for the referral of Medicare patients to ADVENT for hospice services in violation of 42 U.S.C. § 1320a-7b(b), the anti-kickback statute.

3.  As part of this investigation, agents have obtained information and evidence from FBI cooperating witnesses "CW-1"[1], "CW-

---

[1] CW-1 has provided information and services to the FBI over approximately two years and has received no monetary compensation or other consideration from the FBI in exchange for the information and services.  However, CW-1 was employed by a home health care agency ("HHA Alpha"), which served as a cooperating entity supporting the FBI's undercover operation.  As a result of the undercover operation, patient numbers and/or revenue to CW-1 and CW-1's HHA may have increased.  These potential increases to CW-1's HHA may have provided benefit to CW-1 by improving his/her standing with the employing HHA.  A criminal background check of CW-1 revealed convictions for embezzlement, grand theft, and an arrest for false claim to citizenship.  CW-1 is an undocumented immigrant who entered the United States illegally and by presenting false identifying documents to a CBP officer.  The CW-1 later falsely denied having possessed false identifying documents when interviewed by immigration officers.  Although CW-1 is a removable alien, removal has been deferred under the Convention Against Torture.  The CW-1 may have an incentive to curry favor with federal law enforcement because of his immigration status.  After the conclusion of this undercover operation, FBI Agents became aware that during the undercover operation but after HHA Alpha was no longer accepting patient referrals from targets of the investigation, CW-1 was believed to have tried to use his/her role as a source to threaten an individual – with whom he/she had a personal dispute – with a law enforcement investigation into the practices of this individual.  To my knowledge, those threats were never carried out.  CW-1 is not

2"[2], and "CW-3"[3], as well as evidence obtained through the execution of search warrants and corroborating documentary evidence.

## B.   BACKGROUND OF LEGAL FRAMEWORK AND INVESTIGATION

4.    Starting in the 1970s, Congress created, amended, and strengthened the "Anti-Kickback Act", currently United State Code, Title 42, Section 1320a-7b(b).  The relevant language of the statute is listed below.  In essence, the law criminalizes influencing referrals for federally funded health care through payments. The legislative history revealed Congress was deeply concerned the normalization of kickbacks in federally funded health care programs would lead to fraud and an undermining of the quality of patient services since "operators become more concerned with rebates than with care."  FBI Agents began looking into kickbacks in the San Francisco Bay Area, specifically in the fields of home health and hospice.  Their investigation arose from concerns of false billing, referrals without patient care in mind, that health care providers would have a willingness to expose their patients to unnecessary treatments and that certain home health agencies ("HHAs") would have a willingness to bill for, but not provide, necessary services.  The preliminary investigation into kickbacks occurring in the Bay Area in

---

currently the subject of any pending criminal charges.

[2] CW-2 has provided information and services to the FBI and has received no monetary compensation from the FBI in exchange for the information and services. CW-2 has cooperated pursuant to an agreement with the United States Attorney's Office for the Northern District of California to provide information to law enforcement and is seeking leniency from the government with respect to his/her own role related to paying kickbacks in the Northern District of California.

[3] CW-3 has provided information and services to the FBI and has received no monetary compensation from the FBI in exchange for the information and services. CW-3 is a cooperating target of the investigation and is seeking leniency from the government with respect to his/her own role related to paying kickbacks in the Northern District of California.

the fields of home health and hospice revealed that the above concerns were indeed occurring.  Some of the most egregious examples uncovered by the investigation included doctors who referred patients to hospice care in exchange for kickbacks while demanding a "longevity" bonus – meaning the doctor would financially benefit the longer a patient remained on hospice. Since hospice is generally meant for palliative care without curative intent, this system could encourage doctors to abandon curative options earlier with potentially life threatening outcomes.

5.    An undercover operation was selected as the means of investigating kickbacks.  From training and experience, the investigators understood that health care providers and HHAs shrouded their activities in secrecy.  Typically, health care providers were given kickbacks in the form of cash payments made in closed door meetings between themselves and HHA representatives.  Some used bogus medical directorship/consultant contracts to disguise kickbacks as payments for seemingly legitimate, but actually non-existent, services.  Given the expected closed nature of the transactions and the relatively traceless nature of cash payments, traditional documentary and other overt investigative techniques were deemed to be ineffective.  An undercover operation ("UCO") was considered as the most efficient and most successful means to gather direct evidence of the payments and the corrupt intent of the kickback payments.

6.    Around July 2016, two employees of a known Bay Area home health agency ("HHA Alpha") made a complaint to Health and Human Services Office of Inspector General ("HHS-OIG") regarding payments of kickbacks to doctors by other HHAs in the Bay Area.  One of the

two agreed to serve as a cooperating witness ("CW-1").  CW-1 was paired with an undercover FBI agent ("UCE"), based in San Francisco, who would portray himself/herself as someone representing investors, intent on acquiring HHA Alpha and seeking to expand HHA Alpha's patient population through illegal kickbacks.  UCE often communicated with targets in furtherance of the UCO while in San Francisco.  The UCO sought to investigate predicated targets and to use predicated targets to refer UCE to other violators who the targets believed to be engaged in similar conduct.

7.   In designing the UCO, investigators learned health care providers were weary of potential legal risks that caused them to be unwilling to accept kickbacks from an unknown undercover agent without an introduction from a known member of the industry. Further, the nature and size of the kickbacks were dependent on the types of HHA services required.  For example, certain types of insurance and services were reimbursed at a higher rate, which in turn would lead to higher kickbacks.  Many health care providers were also quite concerned with patient satisfaction, partially to avoid a disgruntled patient from questioning the corrupt HHA referral. Therefore, the ability to provide specific details about services, accepted insurance plans, and patient satisfaction was critical to both gaining the initial introductions and to allowing the UCO to expand.  The involvement of a vetted HHA would facilitate entry of the UCO and allow kickback referrals to be diverted away from predicated HHA companies.  Further, the care provided by the vetted HHA could be monitored and reviewed.

8.   In keeping with those goals, HHA Alpha effectively served as a cooperating entity through its management and its participation

4

in the UCO.  The FBI investigation was partly based upon analysis of so-called outlier data – data showing abnormal and potentially illegal conduct – among HHAs and doctors as well as through interviews. Based on examination of the data and interviews, HHA Alpha did not fall into the profile of a likely kickback offender. Checks of FBI databases did not reveal HHA Alpha as a prior or current subject of any investigations.  Additionally, the FBI consulted with HHS-OIG and determined HHA Alpha was not a prior or current subject of any investigations.  From the founding of HHA Alpha in 2009 until the initiation of the UCO, Medicare received two complaints, which were later deemed to be unsubstantiated. Additionally, HHA Alpha's owner was aware that CW-1 would be cooperating with an investigation and the patient paperwork and referrals to HHA Alpha during the UCO were required to be brought to the attention of the investigating agency.  Patients referred to HHA Alpha by physicians and others receiving payment from FBI through the UCO, (1) were contacted by an employee of HHA Alpha to obtain their consent for treatment by HHA Alpha, (2) as a result of this consent and intake process, some patients ultimately did not receive treatment from HHA Alpha because they declined treatment, preferred an HHA of their own choosing, or medical evaluation determined treatment was inappropriate, (3) HHA Alpha was made aware of patients that were referred through the course of the UCO, and (4) FBI conducted interviews of all available patients referred to HHA Alpha and there were no serious allegations of failure in patient care. During the course of the UCO, there was one complaint regarding patient care provided by HHA Alpha made by a recently hired, and then fired employee, but an investigation by the California Department of

Public Health did not result in any negative finding against HHA
Alpha.  No other complaints about HHA Alpha were reported to Medicare
through the duration of the UCO.  During the course of the UCO, a
total of 27 subjects were paid kickbacks and referred patients to HHA
Alpha.  At no time during their meetings with CW-1 and/or UCE did the
subjects express any concerns regarding the treatment of their
patients by HHA Alpha nor notify that any patient complaints had been
received.  Further, none of the subjects indicated they were aware of
any illicit conduct by HHA Alpha prior to or during the UCO.

### C.    AGENT QUALIFICATIONS

9.    I am a Special Agent of the FBI and have been so employed
since 2015.  I am currently assigned to the Complex Financial Crime
Squad of the FBI's San Francisco Field Division.  As part of my
assigned duties, I investigate possible violations of federal
criminal law.  I have received specialized training in health care
fraud matters including, but not limited to, Anti-Kickback, Mail
Fraud, Wire Fraud, and False Claims.  I have participated in the
execution of multiple arrest and search warrants in which business
and personal documents, bank records, computers, and other evidence
of health care fraud and other crimes have been seized.

10.    The facts set forth in this affidavit are based on my own
personal knowledge, knowledge obtained from other individuals during
my participation in this investigation, including other law
enforcement officers, my review of documents and computer records
related to this investigation, communications with others who have
personal knowledge of the events and the circumstances described
herein, and information gained through my training and experience.
This affidavit is intended to show that there is sufficient probable

cause for the requested Complaint and arrest warrant and does not set forth all of my knowledge about this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.  Where excerpts of transcripts of audio recorded conversations are presented, they represent my best effort at this time to transcribe such recordings and I believe them to be accurate in substance.

### D.   COMPLAINANT

11.  **RIDHIMA "AMANDA" SINGH**, is a 33-year-old U.S. citizen who is believed to reside in Livermore, California and is the Chief Executive Officer of ADVENT, as well as, Amity Home Health Care, Inc. ("AMITY") an HHA located in Hayward, California.

12.  **ADVENT CARE, Inc.**, ADVENT is a hospice company located in Hayward, California.  California Secretary of State Records indicated that SINGH is the Chief Executive Officer of ADVENT which was incorporated on March 24, 2015.

13.  I believe that ADVENT holds corporate criminal liability related to hospice patients that were referred to ADVENT via AMITY employees who paid kickbacks in exchange for the referral of Medicare patients for hospice services.  I believe that individuals received kickback payments for the referral of home health patients, as well as hospice patients to SINGH's companies, AMITY and ADVENT.

### E.   STATUTE VIOLATED

14.  **Title 42, United States Code, Section 1320a-7b(b)(2)(A)**, in relevant part, makes it a crime for any person to knowingly and willfully offer or pay any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an

individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

II.   PROBABLE CAUSE

### A.   CASE SUMMARY

15.   During the course of the investigation, the FBI identified AMITY and ADVENT as being involved in a conspiracy to pay kickbacks to doctors and other medical professionals for the certification or referral of patients for home health or hospice services.  In effect, the FBI believed that employees and/or affiliates of AMITY and ADVENT were bribing individuals associated with hospitals, skilled nursing facilities, and doctors' offices in order to induce those individuals to send home health patients to AMITY and hospice patients to ADVENT.

16.   The distinction between home health and hospice care centers on whether or not a patient's condition can be improved.  For hospice, care is provided to terminally ill individuals with a primary focus on pain relief and improving the patient's level of comfort, both physically and spiritually.  Whereas home health care focuses on curative care, such as physical therapy, occupational therapy, and some skilled nursing, with the expectation the patient's condition will improve after receiving the home health services.

17.   While most home health agencies accept both home health and hospice patients, SINGH created ADVENT for the sole purpose of providing hospice services.  In doing so, patients could be divided between ADVENT and AMITY based on the need of the patient and services they required.  As such, patients needing hospice services were routed to ADVENT, while patients in need of home health services were sent to AMITY.

18.   Information provided by CW-1, physicians, and other health care professionals (including, but not limited to, hospital case managers, social workers, and home health marketers) indicated AMITY controlled the majority of patient referrals coming to area HHAs from surrounding hospitals and medical offices.   Per a number of individuals identified during the investigation, AMITY's control over the patient referral market was reportedly the result of the agency's willingness to pay kickbacks for patient referrals and outbid other HHAs engaged in similar kickback schemes.   Based on a review of Medicare claims data of multiple HHAs within the San Francisco Bay Area, AMITY appeared to have significant control of the patient population compared to other HHAs in the surrounding area.   Since January 1, 2013, AMITY has received approximately $105,000,000 in payments from Medicare for home health services purportedly rendered.

19.   According to Medicare claims data, since October 1, 2016, ADVENT has received approximately $10,471,900 in payments from Medicare for hospice services purportedly rendered.

20.   In January 2017, CW-1 identified Glennda Santos ("SANTOS") as a prominent marketer employed by several HHAs in the area, including AMITY.   SANTOS was employed by AMITY as a marketing consultant from approximately August 2015 through the first quarter of 2019.

21.   CW-1 informed agents that SANTOS was participating in a cash-for-patient referral scheme involving physicians, hospital case managers, and employees at skilled nursing facilities throughout the San Francisco Bay Area.   In so doing, according to CW-1, SANTOS would give envelopes of cash to these individuals in order to direct patient referrals to the HHAs, including AMITY.

9

22.   In March 2017, the FBI began the UCO and introduced the UCE as CW-1's business partner.  The UCO initially focused on SANTOS and individuals believed to be accepting kickbacks from her.

23.   As part of the UCO, CW-1 and the UCE told SANTOS that they were partnering to increase the patient population at HHA Alpha.  CW-1 and the UCE told SANTOS that CW-1 and several investors, represented by the UCE, would eventually buy HHA Alpha at a later date.  As part of their agreement, SANTOS would introduce CW-1 and the UCE to individuals willing to accept kickbacks for patient referrals.  The UCE further told SANTOS she would receive an interest in HHA Alpha as compensation for the introductions.  Later, the UCE, CW-1, and SANTOS agreed that SANTOS would be compensated in cash for each patient referral or introduction to physicians, case managers, or other health care professionals who could refer patients to HHA Alpha.

24.   The UCO was based on a referral system; identified co-conspirators would introduce medical professionals to CW-1 and the UCE who were willing to participate in a similar patient referral kickback scheme.

25.   During the course of the UCO, SANTOS introduced individuals she knew to already be engaged in kickback schemes, to include, physicians, case managers, and social workers willing to accept kickback payments in exchange for home health or hospice patients.

26.   On or about August 30, 2017, SANTOS introduced CW-2 to CW-1 and the UCE; CW-2 at the time of the introduction, was employed by AMITY.  During the course of the UCO, the UCE paid CW-2 cash in exchange for patient referrals and the introduction to a medical professional who accepted kickback payments in exchange for the

10

referral of patients.  At this point in the investigation, CW-2 was not a cooperating witness but rather a subject of the investigation.

**B.    AMITY CHECK CASHING SCHEME FOR CASH KICKBACK PAYMENTS IN EXCHANGE FOR THE REFERRAL OF MEDICARE PATIENTS**

27.  On or about March 23, 2017, CW-1 had an in-person consensually recorded conversation with SANTOS in which SANTOS explained how SINGH disguised kickback payments by writing checks to the AMITY marketers SINGH employed with notations such as "entertainment", "reimbursement", "gift", or "donation".  The marketers cashed these checks and used the cash to pay kickbacks to medical professionals.  SANTOS further explained the kickbacks were also disguised as payroll.  In doing so, I believe SINGH paid the marketers a higher payroll amount and used the excess money for kickbacks payments to medical professionals for the referral of patients to AMITY.  The meeting between CW-1 and SANTOS was recorded. This conversation included the following statements, to which, where called for, I have added additional explanation and context based on my training, experience, and facts I have learned through this investigation:

| Speaker | Verbal Statement | Additional Explanation |
|---------|-----------------|------------------------|
| SANTOS: | "Because like this is how I tell Amanda in the beginning, when I first met her in 2009." | Based on the context of this conversation, I believe "Amanda" is a reference to SINGH. |
|  | ... |  |

| Speaker | Verbal Statement | Additional Explanation |
|---|---|---|
| SANTOS: | "So I told her that, do not hire a marketer, cause the money that you're going to spend on your marketer, is the money that you can use to give away." | Typically, a legitimate home health marketer would meet with doctors, hospital case managers, and other health care professionals to provide promotional information about the agency in an effort to obtain patient referrals. Based on my training and experience, however, the term "marketer" is also known to refer to individuals willing to pay kickbacks for the referral of patients.<br><br>I believe the statement "money that you can use to give away" refers to money that can be used for kickback payments. |
| CW-1: | "You can do what?" | |
| SANTOS: | "Do not hire a marketer, cause the money you use for the marketer, is the money that you can use to buy, and that's really, that's what, you hire a runner, not a marketer, and I've been telling [Individual 1] [4] that from the very beginning. You have one marketer as the face but you have one runner, the rest, because you don't have a marketer as the face [unintelligible] $80,000, that's too big, what are you going to do? Pay double double?" | SANTOS is explaining that the marketer is the face of AMITY and the connection or middleman between SINGH and the individual receiving the kickback payment.<br><br>I believe the term "runner" refers to an individual whose sole responsibility is to deliver kickbacks in for form of cash, food, and/or gifts.  The runner is not marketing on behalf of AMITY, but is simply a delivery person who is paid a smaller salary than a marketer. |
| CW-1: | "Where does she get cash from?" | CW-1 is referring to kickback payments in the form of cash. |

---

[4] Throughout this affidavit the names of physicians or individuals not charged during this investigation have been redacted.

| Speaker | Verbal Statement | Additional Explanation |
|---|---|---|
| SANTOS: | "What?" | |
| CW-1: | "How does she get cash from?" | |
| SANTOS: | "She's very smart. She's giving us cash or she's giving us check in our names." | SANTOS is stating SINGH is smart by concealing the kickback payments in the form of a checks made out to the marketers. The marketers would then cash the checks to use the cash as kickback payments. |
| CW-1: | "You cash it out? Ohh k k k." | |
| | ... | |
| SANTOS: | "So so so we we they put it like, they put it on the check like 'entertainment', 'reimbursement', 'gift', uhh 'donation'." | SANTOS is explaining how the kickback payment is disguised by writing checks to the marketers with notations in the memo section, such as "entertainment", "reimbursement", "gift" or "donation". |
| CW-1: | "Oh so she would give it to I'm uhh I'm uhh the employee, how can she do? Or anybody? Or cash, somebody would cash it for her?" | |
| SANTOS: | "They they they cash the payroll and the payroll is so high [unintelligible]." | I believe SINGH would pay the marketers a higher salary or payroll, and then use the excess money for kickbacks payments for the referral of patients to AMITY. |
| CW-1: | "Oh that that makes sense. Yeah yeah that makes sense." | |
| SANTOS: | "Like your donor. You pay yourself $200,000 a year or whatever ya know. Then you have $20,000 every month or $30,000" | |
| CW-1: | "With her it makes sense because she's keeping it. So she can do, whatever she wants to do." | |

13

28.   On January 14, 2019, the Honorable United States Magistrate Judge Kandis A. Westmore approved an application by the FBI for a warrant to search Apple iPhone associated with cellular telephone number 510-585-5059 belonging to SINGH (the "SINGH Account").  I have reviewed the contents of the SINGH Account, which include, among other things, a list of SINGH's contacts, preserved Apple iMessage messages, text messages, and WhatsApp messages.  I believe the following iMessage, text, and WhatsApp conversations, among others, contribute to a showing that probable cause exists to believe that SINGH has violated the above mentioned statutes.

29.   FBI Agents interviewed CW-2 related to a specific WhatsApp text string between CW-2 and SINGH that took place on or about February 5, 2018 through February 6, 2018.  In the WhatsApp conversation, CW-2 and SINGH discussed kickback payments for the doctors that CW-2 managed on behalf of SINGH and AMITY.  This conversation included the following statements, to which, where called for, I have added additional explanation and context based on statements made by CW-2:

| Speaker | Text Statement | Additional Explanation |
|---------|----------------|------------------------|
| CW-2: | **Good morning boss, 2 checks I got for this week will be for [Doctor 1] & [Doctor 2], will need one to lock in Palliative doc [Doctor 3] this week also pls [emoji]** | CW-2 confirmed the receipt of two checks from AMITY written in his/her name.  CW-2 cashed the checks and used the cash to pay both Doctor 1 and Doctor 2.  CW-2 paid each doctor $5,000 in cash that was placed inside an envelope and delivered to them at their respective offices.<br><br>CW-2 understood that the cash was payment for the referral of patients to AMITY.<br><br>CW-2 was requesting an additional kickback payment in the form of a check for Doctor 3. |
| SINGH: | **Ok** | |
| CW-2: | **Thank U** | |
| SINGH: | **Good job** | |
| CW-2: | **[Doctor 3]**<br>**5 for hh & hospice** | CW-2 stated that "5" referred to $5,000 in cash.<br><br>The cash was for a consulting fee which CW-2 understood to mean payment for patient referrals to AMITY.  The doctors received the same amount of money per month no matter how many patients they referred.<br><br>Based on my training, experience, and facts I have learned throughout this investigation, SINGH expects that the doctors or individuals receiving kickback payments on a monthly basis are to exclusively provide patients, specifically Medicare patients to AMITY. |
| CW-2: | **Hi boss, can I get check today for [Individual 1] & [Doctor 3]?** | |
| SINGH: | **Send me full neme if drs** | |

| Speaker | Text Statement | Additional Explanation |
|---------|----------------|------------------------|
| CW-2: | [Doctor 3]<br>[Doctor 2]<br>[Doctor 1]<br>[Doctor 4]<br>[Doctor 5]<br>[Doctor 6] | |
| CW-2: | Hi boss! Just reminding u to bring d checks pls [emoji] | |
| SINGH: | Yes | |
| CW-2: | Thank U [emoji] | |
| SINGH: | I need numbers<br>With each dr<br>[CW-2]<br>???<br>Hurry | SINGH was requesting that CW-2 provide the amount each doctor should be paid so SINGH could write CW-2 checks. |
| CW-2: | [Doctor 3] 5<br>[Doctor 2] 5<br>[Doctor 1] 5<br>[Doctor 4] 3<br>[Doctor 6] 3 | CW-2 stated that the numbers next to each doctor referred to the amount of cash each doctor would be paid, i.e. "5" referred to $5,000 and "3" referred to $3,000. |

30.   CW-2 explained that AMITY took all patient referrals from various insurances, to include, Medicare, Medi-Cal, and private insurance; however, the marketers only counted the Medicare patient referrals.   CW-2 stated Medicare patients were highly desired due to the high reimbursement rates from Medicare and AMITY made its money off the Medicare patients.

31.   In the course of this investigation, the FBI has obtained records from Fremont Bank of Business Regular Checking account ending in 1173 (the "1173 Fremont Account") belonging to AMITY.   SINGH was one of three individuals listed on the 1173 Fremont Account Signature Care Agreement.   The records obtained span the dates of November 16, 2017 through and including March 29, 2019.   Through my review of these records, I have learned that in February 2018, during the same time period as the above mentioned WhatsApp messages, CW-2 received

eight checks, paid to the order of "CW-2" totaling $44,040, ranging in amounts from $4,400 to $6,300.  CW-2 reviewed the eight checks and confirmed that they were signed by SINGH.  The signature on the checks reviewed by CW-2 appeared to match SINGH's signature on the 1173 Fremont Account Signature Card Agreement.  CW-2 stated the purpose of the eight checks was to cash them and use the cash to pay kickbacks to individuals, including doctors, for the referral of patients to AMITY.

32.  CW-2 would cash the checks from AMITY at CW-2's personal bank, as well as a check cashing company located on Castro Valley Boulevard that was utilized to cash checks by multiple AMITY employees.

33.  In the course of this investigation, the FBI has obtained records from Wells Fargo Bank, N.A. of an Expanded Business Checking account ending in 3890 (the "3890 WF Account") belonging to AMITY. The records obtained span the dates of January 1, 2013 through and including December 31, 2017.

34.  Through a review of the financial records of both the 1173 Fremont Account and the 3890 WF Account from November 2015 through and including March 2019, I have learned, among other things, the following:

    a. CW-2 has received approximately 200 checks paid to the order of CW-2 from AMITY for at least $1,077,000.  That cash was intended for payments for referrals to AMITY.

    b. CW-2 stated that SINGH employed multiple marketers. CW-2 knew of at least twelve AMITY employees, including SANTOS, who were instructed to participate in the check cashing scheme to get

cash for kickback payments to pay individuals, to include doctors, for the referral of patients to AMITY.

  c. Based on a review of the 1173 Fremont Account and the 3890 WF Account, the twelve AMITY employees reported by CW-2, have negotiated over $5.5 million dollars in checks paid out in their names. Based on the information from CW-2, there is probable cause to believe that much if not all of that money went to pay for the referral of patients to AMITY.

  d. The checks paid to the twelve AMITY employees, to include SANTOS, were similar in nature to CW-2's checks based on the dollar amount and the number of checks written per month. For example, in February 2018, one of the twelve AMITY employees received approximately six checks totaling $36,090 and ranging in amounts from $5,210 to $6,300 which were similar to CW-2's eight checks that were cashed in February 2018. Additionally, in February 2018, SANTOS received five checks from AMITY in SANTOS' name totaling $28,360 ranging in amounts from $5,210 to $6,480. Therefore, based on CW-2's statements, the recorded statements of SANTOS to CW-1, and the similar nature of the checks, I believe these checks were used for the purpose of paying kickbacks to individuals, to include doctors, for the referral of Medicare patients to AMITY.

  35. CW-2 was a salaried AMITY employee and paid via payroll checks that were direct deposited into CW-2's personally owned bank account. CW-2 occasionally received additional money via bonus checks from SINGH when new accounts were procured; however, bonuses were random and given in physical check form, typically for an amount between $3,000 and $6,000. SINGH made the amount random and often not in hundred dollar increments. The memos written in the memo line

of checks were often not accurate; for example, if the memo said
"bonus", the check was not necessarily payment for a bonus.  CW-2 was
adamant that he/she did not receive any bonus checks in February
2018.  The February 2018 checks were specifically for cash kickback
payments to individuals, including doctors, for the referral of
patients to AMITY.

C.    **AMITY UTILIZED AMERICAN EXPRESS CREDIT CARD ACCOUNT TO
FACILITATE KICKBACK PAYMENTS FOR THE REFERRAL OF HOME
HEALTH AND HOSPICE PATIENTS**

36.   CW-2 described the legitimate role of a marketer in the
home health care industry as someone who sells the HHA's services,
i.e. nursing, physical therapy, occupational therapy, and social work
services.  The marketer would attempt to procure new business/clients
by handing out pamphlets and spreading the word about the HHA.  CW-2
stated, when he/she first became a marketer in the home health care
industry, CW-2 did indeed market as outlined above.  While marketing
for AMITY, SINGH began to trust CW-2 and instructed CW-2 to take
clients out to elaborate meals, sporting events, and purchase gifts
for individuals willing to provide AMITY with patients, mainly
Medicare patients.  When patient referrals were slow, SINGH directed
CW-2 to incentivize clients with gifts in effort to induce them to
refer more patients to AMITY.  CW-2's clients mainly consisted of
case managers at hospitals, social workers at skilled nursing
facilities, doctors, and office staff at doctors' offices.

37.   CW-2 was given an AMITY American Express credit card to
purchase various items including gift cards, gifts, and tickets for
sporting events, concerts, and trips to Las Vegas.  Those gifts were
specifically for the purpose of influencing individuals to refer

patients to AMITY. CW-2 had to ask SINGH for permission prior to using the credit card for expenditures. SINGH set the credit card limit to $1,000 at the beginning of each month and would authorize increases as she allowed CW-2 to make purchases.

38. In the course of this investigation, the FBI has obtained and reviewed records from American Express for credit cards statements related to AMITY. SINGH was the main account holder for the AMITY Business Gold Rewards credit card (the "AMEX Account"). The records obtained span the dates of December 28, 2012, through May 29, 2018 and include a multitude of credit card holders and credit card numbers, to include CW-2.

39. Between January 2016 and May 2018, CW-2's AMITY AMEX Account had over 600 transactions totaling approximately $200,000 worth of expenses charged by CW-2. Those expenses largely broke down into the following categories: entertainment, food and beverage, gift cards, retail, and services.

40. CW-2 stated that the AMITY employees did not always give kickbacks for the referral of patients in the form of cash. AMITY employees would also give gift cards, typically in the form of Visa cards or retail store cards ranging from $300 to $500. Social workers in skilled nursing facilities were typically given gift cards ranging from $2,000 to $5,000 in exchange for patient referrals to AMITY.

41. CW-2 stated that AMITY also paid kickbacks in the form of goods and services, for example, elaborate lunches, happy hours, expensive dinners, Warriors tickets, as well as, high end goods in the form of purses from Gucci, Louis Vuitton, and Nordstrom.

D.   **BRENDA ADDISON UTILIZED AMITY AMERICAN EXPRESS CREDIT CARD ACCOUNT TO FACILITATE KICKBACK PAYMENTS FOR THE REFERRAL OF PATIENTS TO AMITY AND ADVENT**

42.   CW-2 stated that Brenda Addison ("ADDISON") had an AMITY AMEX credit card and was one of the only marketers without a monthly limit.

43.   According to records from the California Employment Development Department ("EDD"), ADDISON has been employed with AMITY starting in the second quarter of 2015 and employed with ADVENT starting in the fourth quarter of 2016.

44.   CW-2 stated that ADDISON was an AMITY marketer and considered to be SINGH's "right hand". CW-2 believed that ADDISON was aware of all the kickback payments made by AMITY employees to individuals, to include doctors, for the referral of patients to AMITY.

45.   According to the AMITY AMEX Account records, between June 2015 and May 2018, ADDISON's AMITY AMEX Account had over 1500 transactions totaling approximately $609,900 worth of expenses charged by ADDISON. Those expenses largely broke down into the following categories: entertainment, food and beverage, travel, and retail.

46.   ADDISON's retail charges on her AMITY AMEX Account were approximately $106,000. Between December 2015 and April 2018, a few of the major retail expenses included approximately $48,800 worth of charges from Chanel, approximately $6,700 from Neiman Marcus, approximately $6,000 from Yves Saint Laurent, and approximately $5,700 from Louis Vuitton. This does not include all of ADDISON's retail expenses.

47.  ADDISON's entertainment charges on her AMITY AMEX Account were over $134,000.  Between December 2015 and April 2018, ADDISON purchased approximately $113,900 worth of charges from StubHub. StubHub is an online ticket marketplace where individuals can purchase or sell tickets for sports, music, and theatre events, including Golden State Warriors basketball tickets.

48.  On or about December 8, 2018, ADDISON and SINGH were part of a WhatsApp text string from the SINGH Account.  In the WhatsApp conversation, ADDISON and SINGH discussed purchasing Warriors tickets for an individual believed to be the Director of Nursing at a rehabilitation center located in Oakland, California.  I believe the Warriors tickets are an incentive for the individual employed as the Director of Nursing to refer patients to AMITY.  This text conversation included the following statements, to which, where called for, I have added additional explanation and context based on my training, experience, and facts I have learned through this investigation:

| Speaker | Text Statement | Additional Explanation |
|---|---|---|
| ADDISON: | don wants to know if he can her tics for the warriors don of [Rehabilitation Center] ? | "DON" is an acronym for Director of Nursing.  I believe ADDISON is referring to purchasing Warriors tickets for the Director of Nursing at a rehabilitation center located in Oakland, California. |
| SINGH: | Are we giving Anything | I believe SINGH's statement, "are we giving anything" is SINGH asking ADDISON if the DON receives kickback payments from AMITY in another form. |
| ADDISON: | no | |
| SINGH: | Ok get it | |

49.   On or about September 25, 2018, ADDISON and SINGH were part of a WhatsApp text string from the SINGH Account.   In the WhatsApp conversation, ADDISON and SINGH discussed purchasing concert ticket in exchange for the referral of patients.   SINGH approved the purchase; however, SINGH wanted reassurances that Individual 2, a hospital case manager in Fremont, California, will refer all of her patients, to include hospice patients to AMITY and/or ADVENT.   This text conversation included the following statements, to which, where called for, I have added additional explanation and context based on my training, experience, and facts I have learned through this investigation:

| Speaker | Text Statement | Additional Explanation |
|---|---|---|
| ADDISON: | gm boss [Individual 2] beyoncé tics these are the ones she wants<br><br>[ADDISON sent SINGH a picture of the pricing for two tickets to the Beyonce & Jay-Z concert scheduled on September 29; two tickets were $926.25 each] | |

| Speaker | Text Statement | Additional Explanation |
|---|---|---|
| SINGH: | Well we can but what will she do for us<br><br>I need full communication<br><br>Hospice all under us<br><br>Check all floors<br><br>And all under us | SINGH is willing to approve ADDISON's request to purchase concert tickets for Individual 2; however, SINGH wants "all under us" which refers to reassurances that Individual 2 will referral all of her patients, to include hospice patients, to SINGH's companies, AMITY and ADVENT.<br><br>I believe this statement directly correlates the concert tickets as an incentive in exchange for patient referrals for home health patients to AMITY and hospice patients to ADVENT.<br><br>I believe "check all floors" to mean that SINGH wants Individual 2 to be aware of all patients on every floor of the hospital and expects Individual 2 to make every effort to refer those patients to AMITY or ADVENT. |
| ADDISON: | i will tell her for sure | |

**E.    SINGH AND MERVINA DEGUZMAN'S ARRANGEMENT RELATED TO KICKBACK PAYMENTS FOR THE REFERRAL OF MEDICARE PATIENTS TO AMITY**

50.    Mervina Deguzman ("DEGUZMAN") was previously employed as the Director of Nursing for Canyon Springs Post-Acute, a post-acute medical care facility located in San Jose, California.  CW-1 provided the following information regarding DEGUZMAN.  DEGUZMAN was fired from the facility for accepting kickbacks from HHAs in exchange for sending companies patient referrals.  Despite losing her position at the facility, DEGUZMAN maintained her relationship with physicians. DEGUZMAN continued to steer patient referrals from those physicians

to the HHAs engaged in a kickback patient referral scheme.   In
approximately January 2018, DEGUZMAN found new employment as a nurse
at Oakland Heights, a skilled nursing facility ("SNF") located in
Oakland, California.   During the course of the UCO, DEGUZMAN received
cash payments from the UCE in exchange for a number of patient
referrals and introductions to medical professionals who could also
refer patients.

51.   On or about November 13, 2018 through November 14, 2018,
CW-2, SINGH, and DEGUZMAN were part of an iMessage text string.   In
the iMessage conversation, SINGH and DEGUZMAN discussed (1) SINGH's
discontent with DEGUZMAN related to the number of Medicare patients
DEGUZMAN was referring to AMITY, to which, SINGH believed did not
adequately correlate with the amount of kickbacks payments SINGH was
providing DEGUZMAN; (2) SINGH's expectation that AMITY should receive
all Medicare patients from DEGUZMAN's SNF; and (3) a renegotiation of
terms, and to have a mutual understanding of the amount of Medicare
patients DEGUZMAN was to refer to AMITY.   This text conversation
included the following statements, to which, where called for, I have
added additional explanation and context based on my training,
experience, and facts I have learned through this investigation:

| Speaker | Text Statement | Additional Explanation |
|---|---|---|
| SINGH: | I did. Notice there weren't barely any referrals<br><br>Are u sending them elsewhere<br><br>Or are they all going to us<br><br>Your consulting fee is 5k and I'm not seeing any patients from u that u are consulting us for<br><br>It's been so many years and i know you are aware of what the expectations are mutually and I have been fulfilling my end along with any other entertainment offers along<br><br>So the question will go back to you are we ok or done? | SINGH confronted DEGUZMAN related to the lack of Medicare patient referrals to AMITY from DEGUZMAN's skilled nursing facility and accused her of working with another HHA.<br><br>I believe "consulting fee" is a means for which to conceal the kickback arrangement for the referral of patients.<br><br>DEGUZMAN's "consulting fee" was 5k, i.e. $5,000. |
| SINGH: | Month of October: 3Mcare and 1 Alliance<br><br>Here's ur stats | SINGH presented DEGUZMAN with the number of patient referral DEGUZMAN sent AMITY for the prior month of October 2018.  SINGH believed that AMITY had only received three Medicare patients and 1 Alliance patient.  I believe "Alliance" refers to Alameda Alliance for Health, associated with Medi-Cal. Medi-Cal is a state sponsored health insurance program administered through Alameda Alliance for Health. |

| Speaker | Text Statement | Additional Explanation |
|---|---|---|
| DEGUZMAN: | I had state survey the second week and federal on the third. The goal was 1-2 a week and we fulfilled. The alliance had Medicare prime.<br><br>Up to you. | DEGUZMAN stated that her goal was to send AMITY one to two Medicare patients per week and that SINGH should count the Alliance patient because that patient had supplemental Medicare insurance as well as Medi-Cal. |
| SINGH: | who else are u referring to<br><br>Can I knwk<br><br>we never talked about any goals<br><br>It was as was going for years<br><br>Knowing how much I do for u u would make sure it's fair | SINGH was asking DEGUZMAN what other agencies DEGUZMAN refers patients to. |
| DEGUZMAN: | I don't refer, social worker does. I just asked to get a third of what goes out. I think we should call or discuss in person | DEGUZMAN stated that the social worker had control of the patient referral process and that DEGUZMAN was only able to control referrals for one third of the patients that were discharged. |
| SINGH: | Why are we going in circles when we knkw what the expectations are | |
| | ... | |
| SINGH: | I just hope u try to understand I have done a lot for u and when u start questioning me it's not fair when I see the numbers<br><br>And hear ur helping outside people<br><br>whatever u want u get<br><br>but at least some fairness should be done | I believe SINGH was stating that the relationship was no longer fair and balanced, meaning that the amount of kickback payments exceeded the number of patients that were actually referred by DEGUZMAN to AMITY. |

| Speaker | Text Statement | Additional Explanation |
|---|---|---|
| SINGH: | I'm not here to fight I'm pretty clear cut and u know that. I'm drama free but things can get to my nerve when I don't see the mutual understanding. Which is Normal. Known u for so long. And u know I'm straight up I don't play games but if we know already what we both want from EACHOTHER why make it hard? | |
| SINGH: | I know u can make things happen.<br><br>This is the census:<br><br>Sept: 4<br>Oct: 3<br>Nov: 1<br><br>How is this 1-2 a week<br><br>with a 5k paycheck warriors tickets lunches being dropped | SINGH presented DEGUZMAN with the number of patients that AMITY received from her in the past few months.  I believe SINGH is only referring to the Medicare patients that were sent by DEGUZMAN.<br><br>SINGH confronted DEGUZMAN that the numbers mentioned above did not adequately reflect their agreement or goal of 1-2 patients per week, especially with the incentives that DEGUZMAN was receiving, i.e. $5,000, Warriors basketball tickets, and lunches all paid for by AMITY. |
| DEGUZMAN: | Disliked "And hear ur helping outside people "<br><br>Your numbers sound inaccurate<br><br>I'll double check | |
| SINGH: | Ok ty<br>Can we make<br>Sure we get all<br>Mervina<br>All Medicare's under us<br>?<br>pls | SINGH was requesting that all the Medicare patients from DEGUZMAN's skilled nursing facility are referred to AMITY for home health services. |

| Speaker | Text Statement | Additional Explanation |
|---------|----------------|------------------------|
| DEGUZMAN: | [CW-2] and I just finished talking last night and this morning — we will go back to how we were tracking before September. We should all see great results! [emoji 👍] | I believe DEGUZMAN was referring to the method of which CW-2 and DEGUZMAN were tracking patient referrals prior to September 2018. |
| SINGH: | I need all under us | I believe SINGH was stating that she wanted all Medicare patients discharged from DEGUZMAN's SNF to be referred to AMITY. |
| DEGUZMAN: | That will get me fired [emoji 😬]  I can lie to you and say yes, but I don't wanna do that  I want a lasting relationship so I wanna be very real and transparent to you and [CW-2] | |
| DEGUZMAN: | Just finished dc meeting, sending you 4 | DEGUZMAN finished a patient discharge meeting and DEGUZMAN stated that she would send AMITY four patients. |
| SINGH: | Ok so give me like a number  Let's say u have 5 dcs in a week  How many in thah week u can give me  Just as an example | SINGH presented DEGUZMAN with a scenario in which DEGUZMAN's SNF had "5 dcs", or five patients to discharge for home health services.  SINGH wanted to know how many of those patients would be directed to AMITY. |
| DEGUZMAN: | 3 | DEGUZMAN responded with "3", i.e. three patients. |
| SINGH: | Perfect I'm happy with thah But let's make sure And if it's 3 then 2 to us And so on | SINGH expressed her contentment with the arrangement that three out of five patients would be referred to AMITY. |

52. CW-2 understood that DEGUZMAN's "consulting agreement" was a means to conceal the kickback payments from AMITY for the referral of Medicare patients from DEGUZMAN's SNF to AMITY.

53. CW-2 stated that DEGUZMAN was paid around $5,000 via check and/or cash approximately once per month. The checks DEGUZMAN received were paid to the order of "2m Solutions", DEGUZMAN's company.

54. Based on a review of AMITY's financial records, to include, 1173 Fremont Account and the 3890 WF Account, DEGUZMAN was paid from April 2016 to January 2019 approximately $113,900 via check paid to the order of either "2M Solutions" or "Mervina Deguzman" purportedly for "consulting" services as indicated in the check memo lines.

55. On or about November 3, 2017, CW-1 conducted a consensually recorded telephone conversation with DEGUZMAN. During the conversation, CW-1 and DEGUZMAN discuss using fraudulent consulting agreements to conceal illegal kickback payments for the referral of patients. This conversation included the following statements, to which, where called for, I have added additional explanation and context based on my training, experience, and facts I have learned through this investigation:

| Speaker | Verbal Statement | Additional Explanation |
|---|---|---|
| DEGUZMAN: | So but mean time you can say that you can do a contractual, contractual work, like her work, her paid work is based on caseload, but it's, it's the politically correct way to say, you know, they're not paid patients but you know you cannot pay for a patient, cause its illegal, but then you can pay for labor. | I believe DEGUZMAN is explaining to CW-1 how to conceal kickback payments by using a contractual agreement since it's illegal to pay for a patient referral.<br><br>I believe DEGUZMAN's statements show her knowledge that paying kickbacks for patient referrals is illegal. |
| CW-1: | So uh- uh how how do we do that? What- what numbers do you want me to put in there? | |
| DEGUZMAN: | So so what you can do with your with your like if you want them as just associate consultant doctors which means like if they refer a patient to you, they're, they do their face to face, they see the patient, like they do the inter-disciplinary meetings, anything that concerns their time. | |
| DEGUZMAN: | You pay per hour, right? Like you can say um $320 per hour or $295 per hour or something like that ok? | |
| CW-1: | Make make up some numbers and then- and reflect that. | |

| Speaker | Verbal Statement | Additional Explanation |
|---------|------------------|------------------------|
| DEGUZMAN: | Yeah, you make up the number and then you calculate the referrals based on that hourly, without paying them per patient, but essentially it's kind of the same but you make the amount for month to month, cause you don't want to raise a red flag for the both of you. | I believe DEGUZMAN is confirming that the CW-1 should falsify an hourly consulting agreement in order to conceal kickback payments for patient referrals and the hourly rate would then be calculated based on the number of patients referred.<br><br>I believe DEGUZMAN's statement "you don't want to raise a red flag for the both of you" is referring to not drawing unnecessary attention to financial records related to the payment of physicians that may be reviewed during Medicare/Medicaid audits that would be conducted by federal or state agencies. |

56.   Based on DEGUZMAN's statements with CW-1 and the WhapsApp communication between SINGH and DEGUZMAN, I believe DEGUZMAN had a fraudulent consulting agreement with SINGH to conceal kickback payments for the referral of patients to AMITY.

**F.   STATEMENTS MADE BY SINGH ON JANUARY 16, 2019 TO CW-2 AND INTERVIEWING AGENTS REGARDING KICKBACKS FOR PATIENT REFERRALS**

57.   On January 16, 2019, CW-2 was approached by FBI Agents and agreed to consensually record a phone call with SINGH to request permission to pay for a social worker's trip to Napa, California as an incentive for the referral of patients to AMITY.  The conversation was recorded.  This conversation included the following statements, to which, where called for, I have added additional explanation and

context based on my training, experience, and facts I have learned
through this investigation:

| Speaker | Verbal Statement | Additional Explanation |
|---|---|---|
| CW-2: | "Hey, Amanda, I wanted to talk you about the Vi [unintelligible] hospital, I um there's a new social worker I just spoke to her and they're planning on a Napa trip and I think I can get them to do this." | "I think I can get them to do this" refers to CW-2's ability to influence the social worker to send patient referrals to AMITY by providing the social worker with a trip to Napa. |
| SINGH: | "Good." | |
| CW-2: | "Do you think you can just like, um like add it on the bonus you're gonna give me?" | CW-2 initially thought that SINGH would pay for the trip by paying CW-2 with a "bonus" check written in CW-2's name. |
| SINGH: | "What do you mean about the bonus?" | |
| CW-2: | "I can just-I can just pay for it now or when." | |
| SINGH: | "No, just use your credit card, you're supposed to use your credit card for that." | |
| CW-2: | "Ok. Ok." | |
| SINGH: | "Yeah, you're supposed to use your credit card. I mean, the Napa, you're probably gonna go right? So you take everyone with the credit card. Yeah just use the credit card, use the AMEX credit card when you go. Hello?" | |
| CW-2: | "I'm sorry, sorry I can't-you were cutting off. Ok so-" | |
| SINGH: | "Use your credit card, I'm not going to give you cash on that. You're supposed to use your credit card for that." | SINGH was instructing CW-2 to utilize the AMITY AMEX credit card and was not going to provide CW-2 with cash via a purported "bonus" check. |
| CW-2: | "And then you're just pay that back, ok, yeah?" | |

| Speaker | Verbal Statement | Additional Explanation |
|---------|------------------|------------------------|
| SINGH: | "No, no you use the American Express, the work card. The work card. We'll open it up for you. Yeah." | The AMITY marketers receive an AMITY American Express credit card. |
| CW-2: | "Oh, ok, [UI] got it. Thank you." | |
| SINGH: | "So you're going to use your work card, so when you go we'll open up the card for you, ok, alright, cool?" | Most of the AMITY marketers start with a $1,000 monthly budget and SINGH has to approve the expenses. SINGH's statement "we'll open up the card for you" refers to giving CW-2 a higher credit limit. |
| CW-2: | "Ok, thank you thank you, bye." | |
| SINGH: | "For sure, for sure, ok bye." | |

58. On January 16, 2019, SINGH was interviewed in person by FBI Agents at AMITY's office located in Hayward, California. SINGH was aware of the Agents affiliation with the FBI and was advised that it was a crime to lie to a federal law enforcement officer. The interview between Agents and SINGH was surreptitiously recorded in its entirety. During the interview, SINGH stated that she was aware of the Anti-Kickback statute and understood that paying kickbacks for patient referrals was illegal.

59. During the interview, SINGH was asked what the job responsibilities entailed for an AMITY marketer. SINGH explained the marketer's role was to inform facilities of the home health services that AMITY could provide. SINGH stated that the marketers also brought the facilities small gifts under $20 and usually in the form of food, i.e. cookies and/or donuts. SINGH's understanding was that per Medicare, AMITY was allowed to provide food under $20 for the facilities the marketers were visiting. SINGH falsely represented that AMITY had never provided anyone with gift cards, cash, expensive

34

dinners, and/or trips for the referral of patients to AMITY.   SINGH
made the following statements to FBI Agents:

>**SINGH:** Hi, I'm Amity, so this is what we do, here's our
>brochures, you know, give us a try if you can, you know it's per
>facility, its $5, $10 you can bring some donuts for the
>facility, right.
>
>**AGENT 2:** Yeah, what can you do?
>
>**SINGH:** Well Medicare law is $15, $20, so we try to bring donuts
>for the facility, but you can do that kind of stuff, ok,
>cookies, donuts.
>
>**SINGH:** 15-20 bucks, cookies so I'll be honest that's what we do.
>15-20 bucks [UI] cookies, so brochures we just slide them, but
>these people are so hard to deal with, and I'll be honest.
>Filipinos like working with other people, and it's just so hard,
>it's like keep knocking on the doors, keep knocking on the doors
>and that's all we do.  So I've hired people and I've very fully
>stopped training, just stop and knocking that, and one thing
>about me I don't underpay people because, you know I like paying
>people what they deserve, 120, 130 people on a fixed salary,
>they're going marketing it's like you know.
>
>...
>
>**AGENT 1:** So to be clear, and I, I've seen this with other
>companies and so I feel like I have to ask.
>
>**SINGH:** You have to, you have full right.
>
>**AGENT 1:** And um, you've never given anybody gift cards?
>
>**SINGH:** No. Absolutely not, no.
>
>**AGENT 1:** Cash?
>
>**SINGH:** No.
>
>**AGENT 1:** Um, anything more than the $20?
>
>**SINGH:** No. It's always been cookies, donuts, it's always been
>these type of things we've always given out.

**AGENT 1:** No food or dinner?

**SINGH:** Well, food yeah, yeah.

**AGENT 1:** Outside of what you said, the cookies and donuts.

**SINGH:** No, it's always been food though, it's always been food.

**AGENT 1:** And no like expensive dinners, trips?

**SINGH:** No, it's been food. No.

**AGENT 1:** Um, any trips?

**SINGH:** No, it's been food.

60.   The interview on January 16, 2019 between Agents and SINGH took place shortly after SINGH's phone call with CW-2 where SINGH instructed CW-2 to pay for a Napa, California trip using the AMITY AMEX credit card to incentivize a hospital social worker to refer patients to AMITY.   During the interview, Agent 1 gave an example specifically referring to incentivizing a hospital with a trip to Napa.   SINGH falsely represented that she did not, or would not pay for trips for individuals, to include doctors or case managers, for the purpose of patient referrals to AMITY.   SINGH made the following statements:

**AGENT 1:** We've talked to different people saying that you and your company have taken people on trips, for patient referrals and for working with Amity, is that-

**SINGH:** No, not at all, we don't take anyone.

**AGENT 1:** No?

**SINGH:** I mean just me and my team we go out for dinners and stuff or me.

**AGENT 1:** Yea, what do you do for like-

**SINGH:** I mean it's my birthday coming up I'll be honest, my team goes out for dinner with me, it's always been my team or inside my office we go out, yea it's never been outside though. It's

always been my team members, always.

**AGENT 1:** And when you say team members, just?

**SINGH:** My marketers and me.

**AGENT 1:** Your marketers and you?

**SINGH:** Of course, I can take my employees anywhere I want.

**AGENT 1:** Ok, ok, just your employees.  You've never taken any like other case managers or doctors?

**SINGH:** No.  My employees always been, me and my employees.

**AGENT 1:** And then another thing I want to clear up is I've heard there are trips to Vegas.

**SINGH:** It's been my employees always been me and my employees, yea, you can even ask, my employees always go with me.  Yea I will admit to that. It's always been, my employee [UI] girls trip for my employees, always.

...

**AGENT 1:** So no doctors, no case managers?

**SINGH:** No, absolutely not.  They are old!  Why would we take these old-sorry?  No, no offense, no offense.  I take my girls I'll be honest [UI] take my marketers and me, hell yeah, we party hard, me and my marketers, my girls we party it.  I will be affirmed to that.  Yea I [UI] we go out we party it up.

**AGENT 1:** And no, no entertaining people?

**SINGH:** No, no absolutely not.

**AGENT 1:** I want to deal with this hospital-

**SINGH:** Hell no.

**AGENT 1:** -so I'll take them to, I don't know,

**SINGH:** Oh my god, no.

**AGENT 1:** -to like, Napa is close by or something.

**SINGH:** Fuck no, I'm sorry can I say that?

**G.   SINGH ENGAGES IN WITNESS TAMPERING FOLLOWING THE EXECUTION OF SEARCH WARRANTS**

61. At the time of the UCO, CW-3 was employed as a hospital case manager with the ability to refer patients to HHAs. The UCE paid CW-3 cash in exchange for the referral of patients. According to the California Employment Development Department ("EDD") records, CW-3 was employed by SINGH at ADVENT starting in quarter two of 2018.

62. On January 10, 2019 and January 15, 2019, the Honorable United States Magistrate Judge Kandis A. Westmore approved applications by the FBI for a warrant to search the business offices of AMITY and ADVENT and a warrant to search the Apple iPhone belonging to CW-3, respectively. On January 16, 2019, FBI Agents executed multiple search warrants to include AMITY and ADVENT's business offices located in Hayward, California and CW-3's Apple iPhone.

63. On January 25, 2019, FBI Agents interviewed CW-3. During the interview, CW-3 stated that he/she avoided talking to SINGH after the execution of the search warrants. However, SINGH continued calling and eventually CW-3 accepted the phone call. CW-3 stated during the phone call, SINGH reassured CW-3 that she (SINGH) would be fine and would likely only receive a fine and a slap on the wrist. When CW-3 mentioned to SINGH that the search warrant referenced travel, SINGH instructed CW-3 to not say anything about travel. CW-3 knew SINGH was referencing a trip to Las Vegas. CW-3 understood SINGH was instructing CW-3 to lie about the Las Vegas trip.

64. After the execution of the search warrant for CW-3 phone, CW-3 informed AMITY employees that FBI Agents had seized his/her phone. CW-3 believed that an AMITY employee had attempted to erase CW-3's phone remotely but was unsuccessful.

65.  While being interviewed by Agents, CW-3 received several phone calls on his/her cell phone from SINGH.  CW-3 did not answer the calls but made Agents aware that SINGH was attempting to reach him/her.  After several attempts by SINGH, CW-3 eventually answered and consensually recorded the conversation with SINGH via phone. During the conversation, SINGH made the following statements:

**CW-3:** Hey, um the FBI called me, they wanna meet with me to bring back my phone, what should I do?

**SINGH:** Ok, um, just tell them you have a lawyer.  Tell them you have a lawyer and they need to speak to my lawyer cause we have a lawyer.

...

**CW-3:** I know but what if, you know, was my phone erased though?

**SINGH:** Yeah, it was erased. It is been erased. Don't worry about it.

...

**SINGH:** So if they show up you're gonna say, I have a lawyer, you need to speak to my lawyer, that's it.

**CW-3:** I know but I'm just scared because I keep reading the warrant over and over again.  What do I say?  What if they ask me about the traveling?

...

**CW-3:** No but wait, wait can you just help me really fast about the traveling part?

**SINGH:**  No say you never went on any travel, say you didn't, that's it, that's it.

**CW-3:** Ok, ok.

**SINGH:** I've got it covered from there, that's it.

66.  During the interview with Agents, CW-3 stated while employed as a case manager, CW-3 was initially paid $2,000 per month,

which was gradually increased to $5,000 per month. CW-3 was paid cash in an envelope. Often the envelope was hidden in AMITY coffee mugs used for marketing purposes. CW-3 also received gift cards on his/her birthday. CW-3 understood the purpose of the payment, gift, or items, was ultimately to direct patients, to include Medicare beneficiaries, to AMITY.

67.   CW-3 stated the trip to Las Vegas was paid for by SINGH and included AMITY marketers, to include, SANTOS, CW-3, and another hospital case manager. CW-3 was hesitant to go on the trip because he/she was worried how it looked. SINGH flew the AMITY marketers to Las Vegas on a private jet but CW-3 and the other case manager flew to Las Vegas separately on a commercial airline, paid for by SINGH.

68.   In approximately March 2017, there were three transactions charged to the AMITY AMEX Account related to airfare expenses from Southwest Airlines. The Southwest expenses were for three airline tickets from the San Francisco Bay Area to Las Vegas McCarran airport with a departure date of March 31, 2017. The Southwest passengers listed on the AMEX Account statement included the following names: DEGUZMAN, CW-3, and the hospital case manager CW-3 mentioned during the interview.

### H.   THE USE OF THE MEDICAL DIRECTORSHIP ROLE TO CONCEAL KICKBACK PAYMENTS FOR THE REFERRAL OF MEDICARE PATIENTS

69.   FBI Agents interviewed CW-2 related to a specific WhatsApp text string between CW-2 and SINGH that took place on or about February 26, 2018. In the WhatsApp conversation, CW-2 and SINGH discussed kickback payments for the doctors that CW-2 managed on behalf of SINGH and AMITY. This conversation included the following

statements, to which, where called for, I have added additional explanation and context based on my training, experience, and facts I have learned through this investigation:

| Speaker | Text Statement | Additional Explanation |
|---------|----------------|------------------------|
| CW-2: | Good morning boss! It's almost month end, can [AMITY Marketer 1] get check for [Doctor 7]? Would hate to loose her [emoji ☹] | CW-2 was requesting that SINGH write a check for Doctor 7.  I believe CW-2 wanted to ensure that Doctor 7 was paid so that AMITY would not lose Doctor 7's business, i.e. patient referrals to AMITY.<br><br>CW-2 stated that AMITY Marketer 1 initially paid kickbacks to Doctor 7 prior to quitting AMITY.  Once AMITY Marketer 1 was no longer employed at AMITY, the responsibility transferred to CW-2. |
| SINGH: | OkI<br>Whata full name<br>And amount | |
| CW-2: | [Doctor 7]<br><br>3 from Amity<br>2 from Advent | CW-2 stated that Doctor 7 was paid $3,000 from AMITY and $2,000 from ADVENT for the referral of patients to each company respectively. |
| SINGH: | Ok so Advent tell Brenda | I believe "Brenda", i.e. ADDISON, was in charge of managing kickback payments for ADVENT. |
| CW-2: | Ok will do<br>Thank U | |

70.  CW-2 stated that Brenda Addison ("ADDISON") was an AMITY marketer and considered to be SINGH's "right hand".  CW-2 believed that ADDISON was aware of all the kickback payments made by AMITY employees to individuals, to include doctors, for the referral of patients to AMITY.

71.  On or about February 26, 2019 and March 2, 2019, AMITY Marketer 1 and SINGH communicated via WhatsApp in which AMITY

Marketer 1 requested a check for Doctor 7.  In the WhatsApp
conversation AMITY Marketer 1 informed SINGH that Doctor 7 referred
three Medicare patients to AMITY.  This conversation included the
following statements, to which, where called for, I have added
additional explanation and context based on my training, experience,
and facts I have learned through this investigation:

| Speaker | Statement | Additional Explanation |
|---------|-----------|------------------------|
| **AMITY Marketer 1:** | **Don't forget [Doctor 7] boss!** | AMITY Marketer 1 was informing SINGH to not forget to write a check for Doctor 7. |
| **AMITY Marketer 1:** | **Good morning beautiful! Can you get [Doctor 7] check ready for this month boss? She already gave three HH medicares for this month!(: she is trying to get us hospice as well [emoji 🙏🙏🙏😊😊] can you also write for me 6 boss, 2 of it is for me next Thursday the 8th, I'm meeting with a cm whom I'm trying to lock down and steal from [HHA 1] [emoji 😂😂😂😂😂]** | AMITY Marketer 1 was requesting that SINGH provide a check for Doctor 7. Doctor 7 had already referred AMITY three Medicare patients that month and was attempting to refer a hospice patient to ADVENT.  I believe this statement directly correlates the payment for the Medicare patient referrals to AMITY.

I believe the statement "write for me 6" refers to AMITY Marketer 1's request for SINGH to write a check for approximately $6,000 and $2,000 will be used to incentivize a "cm" or case manager to refer to AMITY instead of HHA 1.  HHA 1 is an HHA located in the San Francisco Bay Area.


AMITY Marketer 1 was one of the individuals that CW-2 listed as part of the check cashing scheme to get cash to pay individuals for patient referrals to AMITY. |
| **SINGH:** | **Pls tell Brenda and [CW-2]** | |

72.  CW-2 stated Doctor 7 was one of AMITY's medical directors and had a medical director contract.  The consulting and medical director contracts with the doctors were the same type of "consulting agreement" SINGH had with DEGUZMAN in that the medical director relationship equated to sending patients to AMITY for money.  CW-2 stated that some of the doctors were paid via check and others via cash.

73.  Through a review of the 1173 Fremont Account financial records from March 2018 through and including January 2019, Doctor 7 received approximately 12 checks for a total of approximately $36,000 purportedly for "medical directorship" services as indicated in the check memo lines.  According to Medicare claims data during the same timeframe, Doctor 7 referred at least 23 Medicare patients to AMITY. In turn, Medicare reimbursed AMITY approximately $145,000 for those patients.

74.  On January 16, 2019, as part of the same interview between Agents and SINGH, SINGH discussed the role of medical directors at AMITY and stated that she only employed two to three doctors as medical directors due to the amount of patients under AMITY's care. SINGH stated that she required at least two medical directors due to AMITY's patient census or patient count, which according to SINGH, was over 1000.  My understanding of SINGH's statements related to the number of medical director on staff, was that two to three medical directors were sufficient for a patient population of 1,000 and two to three was the amount SINGH typically employed on any given month. SINGH continued to explain that it was illegal per the Stark Law for medical directors to refer to the company that employed them, i.e. AMITY.  SINGH made the following statements:

**AGENT 1:** So, how many medical directors do you have right now?

**SINGH:** We have right now, as of right now three because of my census.

**AGENT 1:** Three.

**SINGH:** We have over 1000 census so we have to have.

**AGENT 1:** Right. May I ask who your medical directors are?

**SINGH:** [Doctor 8] right now and Doctor Bhandari and we have, and I think we work on [Doctor 9] he's under the work but he says he's going to let me know, but right now it's these two or three, that's all we have right now.

**AGENT 2:** So they have their own other patients like doing their other-

**SINGH:** But they don't send us too many patients they send us to be honest with you, because of the level of high skilled level they give us, so I'll be honest, 1000 patients you can't- you can't really pull out of them and they're not supposed to be doing that, that's against the law.

...

**AGENT 1:** So wait, wait, I want to make sure I understand, um, uh, just so I-I got a clear picture. So I know the stark law-

**SINGH:** They're not supposed to be referring patients.

**AGENT 1:** Right, they're not supposed to refer patients as long as they are medical directors.

**SINGH:** Correct, correct.

**SINGH:** But even if they do, I think it's only for a certain amount, but only if the patients qualify for home health, but there's only a certain level they can do they can't be referring the whole thing as an agency. Let's just say you own an agency, they can't own an agency but they can't be referring everything to the agency, like ok I'm going to be the medical director, but I'm going to give everything to this agency so the whole agency is just do and doctors.

**AGENT 2:** Yea, because it'd be profiting off the- help them.

**SINGH:** Yea, they can't do that that's again the law that's what Starks law is.

**AGENT 1:** Right.  Ok.

**SINGH:** That's what stark's law is.

**AGENT 1:** And that's not happening in the [UI].

**SINGH:** Yea.

**AGENT 1:** If, I mean, I'm sure it happens, do you get referrals from medical directors?

**SINGH:** We actually, no, we don't.

**AGENT 1:** How does that work.

**SINGH:** We actually get a couple be honest with you, but its 1,000 census, you can go through it, it's nothing of that sort-

**AGENT 1:** Ok.

**SINGH:** -nothing of that sort.

**AGENT 1:** There's no like payment for-

**SINGH:** No, no, no, no, no, no, no, no absolutely not.

**AGENT 1:** I know, I know.

**SINGH:** And they're legit check by the way, we give them a check.

**AGENT 1:** Ok.

**SINGH:** We give them a legit check, so they're on our check. Its check, it's not even like that.

**AGENT 2:** Oh you mean their payment.

**SINGH:** Yea, we give them a check, a proper check.

75.   Based on my training and experience, I am familiar with the Stark Law (42 U.S.C. § 1395nn), a law generally making it illegal, punishable by civil penalties and exclusion from participation in Federal health care programs, for a physician to refer patients for home health care services to an HHA with which the physician has a compensation arrangement, absent the application of a safe harbor provision.  Because of this law, in my training and experience,

physicians who legitimately enter into agreements to act as medical directors or consultants for home health care agencies endeavor to avoid also making referrals to those agencies.  The extensive practice of physicians receiving director or consulting payments from AMITY while contemporaneously referring patients to AMITY further demonstrates that probable cause exists to believe that such payments were made illegally in exchange for the patient referrals.

76.   Through a review of the financial records of both the 1173 Fremont Account and the 3890 WF Account from January 2013 through and including March 2019, I have learned, among other things, the following:

a. Between January 2013 and March 2019, approximately 789 checks were paid to at least 53 different doctors totaling approximately $2,233,000.

b. In the course of this investigation, I have obtained and reviewed Medicare billing records for AMITY.  Based on a review of the 3890 WF Account and the 1173 Fremont Account records and Medicare records, between January 2013 and March 2019, AMITY made payments to numerous doctors who at some point, were listed as attending physicians for claims AMITY submitted to Medicare at the same time they were receiving payments from AMITY.

c. Based on a review of the memo lines on checks to doctors during this same time period, which purportedly described the purpose of the payments, SINGH, through AMITY, paid numerous doctors to act as medical directors or consultants at the same time. Notably, in December 2018 the month before SINGH was interviewed by

Agents, AMITY paid 11 doctors approximately $33,000 via check for "medical director" or "consultant" services as indicated in the check memo lines.

77.   In the interview between Agents and SINGH, SINGH falsely represented the number of medical directors purportedly employed at AMITY and the amount of patient referrals AMITY received from those medical directors.

78.   SINGH stated that "Dr. Bhandari", known to Agents as Bhupinder Bhandari ("BHANDARI"), a physician operating medical offices in Hayward and Pleasanton, California, was one of the three medical directors contracted by AMITY.

79.   BHANDARI received $136,500 in payments, via check, from AMITY between May 2014 and December 2018.   During this same period, BHANDARI was listed as the attending physician for approximately 230 beneficiaries for whom AMITY submitted claims to Medicare.   In turn, Medicare reimbursed AMITY approximately $1,532,400 for those patients.

80.   According to Medicare claims data, BHANDARI nearly doubled the number of patients he referred to AMITY following his acceptance of a medical directorship with the company.

81.   In the course of this investigation, the FBI has obtained records from Fremont Bank of Business Small Checking account ending in 1130 (the "1130 ADVENT Fremont Account") belonging to ADVENT. SINGH was one of three individuals listed on the 1130 ADVENT Fremont Account Signature Care Agreement.   The records obtained span the dates of November 16, 2017 through and including September 28, 2018. I have learned, among other things, the following:

47

a. In the course of the investigation, the FBI has obtained Medicare billing records for ADVENT from January 2015 and September 2019.  Based on a review of the 1130 ADVENT Fremont Account records and Medicare records, ADVENT made payments to four doctors who at some point, were listed as attending physicians for claims ADVENT submitted to Medicare at the same time they were receiving payments from ADVENT.

b. Those four doctors, which include BHANDARI, have received $116,000 in payments, via check, from ADVENT between January 2018 and October 2018.  According to Medicare claims data from January 2018 to September 2019, the four doctors referenced were listed as the attending physician for ADVENT beneficiaries, and were responsible for a total of approximately $6,925,400 of the $6,988,500 that ADVENT received in reimbursements from Medicare.

c. From October 2016 to September 2019, the four doctors referenced, that received payments from ADVENT, were responsible for a total of approximately $9,621,200 of the $10,471,900 that ADVENT received in reimbursements from Medicare.

d. The four doctors referenced received payments, via check, for a total of approximately $326,250 from AMITY as well.

82.  On January 15, 2019, the Honorable United States Magistrate Judge Kandis A. Westmore approved applications by the FBI for a warrant to search the business office and cell phone associated with Dr. Gerald Myint ("MYINT"), an internal medicine physician located in Hayward, California.  On January 16, 2019, FBI Agents executed the search warrants on MYINT's office and cell phone.  During the execution of the search warrants, MYINT was interviewed in person by FBI Agents at MYINT's office located in Hayward, California.  MYINT

was aware of the Agents' affiliation with the FBI and was advised
that it was a crime to lie to a federal law enforcement officer.  The
interview between Agents and MYINT was surreptitiously recorded via
audio recording device in its entirety.  During the interview, MYINT
identified SINGH from a current DMV photograph.  MYINT described
SINGH as an owner or a boss at AMITY.  Approximately four years ago,
MYINT and SINGH negotiated a deal for MYINT to obtain a payment of
$2,500 per month for referring his patients to AMITY.  MYINT
estimated he referred two to three, and sometimes seven to eight
patients to AMITY per month during this time.  MYINT referred to the
payments he received as "gifts."  During the negotiation, SINGH
wanted MYINT to be the medical director for AMITY.  When Agents asked
if MYINT was truly a medical director for AMITY or if the position
was just on paper, he said that he signed a contract with AMITY.
However, MYINT stated that he honestly did not physically go to AMITY
very often and handled matters by phone.  MYINT estimated he worked
less than ten hours per month as the medical director at AMITY and
the job only lasted for the first year when he was being paid by
check.  MYINT was not working as the medical director for AMITY when
he was receiving cash payments.

83.  After receiving monthly checks from AMITY for approximately
one year, MYINT felt he may be doing something wrong or perhaps
illegal.  Therefore, he stopped his relationship with AMITY and
stopped receiving checks.  Then, MYINT heard of other doctors
receiving kickback payments and decided to continue receiving
kickback payments from AMITY.  Approximately one year after he
stopped receiving checks from AMITY, MYINT and SINGH renegotiated the
terms of kickback payments.  SINGH agreed to pay MYINT $3,000 in cash

per month for referring his patients to AMITY.  Since this new
agreement was made approximately two years ago from the date of the
interview, MYINT had been receiving an envelope filled with $3,000 in
cash every month from AMITY.  According to MYINT, SINGH initially
delivered checks to him directly, and she was the person who
negotiated the terms of the payment with him.  SINGH's assistant,
whom MYINT only knows as "Brenda", believed to be ADDISON, later
delivered the money to him every month.  ADDISON would normally
contact MYINT on his cellular telephone to ensure he was in the
office, then deliver the cash, consisting of $100 bills, in an
envelope to his office.  MYINT told the FBI that the most recent cash
delivery he received from ADDISON was an envelope filled with $3,000
in cash earlier in the same month as the interview, January 2019.

84.  MYINT received two checks in 2013 for $2,500 for purported
consulting services.  In October 2016 though and including July 2017,
MYINT received approximately five checks ranging between $4,975 and
$6,250.  The total amount received via check was approximately
$31,200.  According to AMITY's Medicare billing data from January
2013 to January 2, 2019, MYINT was listed as the attending physician
for approximately 242 beneficiaries for whom AMITY submitted claims
to Medicare.  In turn, Medicare reimbursed AMITY approximately
$1,319,100 for those patients.

85.  Based on the pattern of payments, the purported purpose of
these payments noted on the checks sent to the doctors, the billing
for patients referred to AMITY and ADVENT by those same doctors
receiving payments, information provided by CW-2, and SINGH's own
communications, I believe these doctors received these payments as a

kickbacks from AMITY and ADVENT in exchange for the referral of Medicare patients.

**I. SINGH REQUESTS AMITY EMPLOYEES TO ACQUIRE HOSPICE PATIENTS REFERRALS**

86. On or about January 9, 2019 through January 10, 2019, CW-2, SINGH, and AMITY Marketer 2 ("AM-2") were part of an iMessage text string from the SINGH Account.  In the iMessage conversation, SINGH requests that CW-2 and AM-2 attempt to acquire hospice patient referrals. This text conversation included the following statements, to which, where called for, I have added additional explanation and context based on my training, experience, and facts I have learned through this investigation:

| Speaker | Text Statement | Additional Explanation |
|---------|---------------|------------------------|
| SINGH: | **Let's get those hospice places as well**<br><br>**And make sure Hh is all Locked** | I believe SINGH is requesting that CW-2 and AM-2 acquire patient referrals from health care facilities that have the ability to refer both hospice patients and well as home heath patients.<br><br>I believe the term "locked" refers to SINGH requesting that the health care facilities refer patients only to AMITY and ADVENT. |
| CW-2: | Ok boss [emoji 🔐] | |
| AM-2: | Ok [emoji 🔐] | |

| Speaker | Text Statement | Additional Explanation |
|---------|---------------|------------------------|
| CW-2: | Boss, as of today SJ has 30, we'll do our Very Best tomorrow to get at least 10!!! #40weekgoal [emoji ☺] | I believe CW-2 is stating that the AMITY marketers responsible for the San Jose area received 30 Medicare patient referrals in one week.  CW-2 then states that they will do their best to acquire 10 more patient referrals for a weekly goal of 40.<br><br>I believe the numbers CW-2 is referencing are Medicare patients due to CW-2 statement that the AMITY marketers only counted the Medicare patients. |
| SINGH: | Love ir<br>My besties<br>My ladies<br>Make it happen<br>Bonuses<br>For u both<br>Get me hospice too o<br>Proud of u both | I believe SINGH is explicitly requesting that CW-2 and AM-2 get hospice patient referrals.<br><br>AMITY does not bill Medicare for hospice services, only ADVENT; therefore, the hospice referrals would be for ADVENT only. |
| AM-2: | Yes we will [emoji 🙏🙏]<br>Ty [emoji ☺☺] | |
| SINGH: | Kicking ass | |
| CW-2 | Yes mine will come thru in d morning & [AM-2] got 1 today, will get more tomorrow | I believe CW-2's patient referral was scheduled to come in that morning and AM-2 received a referral that day. |
| | ... | |
| AM-2: | Yes working on hospice will get them soon | AM-2 Confirms they will attempt to acquire hospice referrals. |
| SINGH: | amen | |

III. PROBABLE CAUSE FOR THE VIOLATION

87.  **Title 42 United States Code, Section 1320a-7b(b)(2)(A)**, in relevant part, makes it a crime to knowingly and willfully offer any

remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any service for which payment may be made in whole or in part under a Federal health care program.

88.   Medicare is a federally funded health insurance program that provides funds for health care services provided to individuals aged 65 or above, and to certain disabled persons.   The U.S. Department of Health and Human Services ("HHS"), Centers for Medicare and Medicaid Services ("CMS") administers the Medicare program, which is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

89.   Therefore, the referral of Medicare patients for hospice services, which is subsequently billed to Medicare, constitute a referral for an individual to a person for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program; and an arrangement or ordering of a service for which payment may be made in whole or in part under a Federal health care program, as defined by 42 U.S.C § 1320a-7b(b)(1)(A) and (B).

90.   There is probable cause to believe that SINGH, acting through and on behalf of her company, ADVENT, has knowingly and willfully, directly or indirectly, offered kickback payments to doctors, case managers, social workers, and other healthcare professionals in exchange for the referral of Medicare patients, in violation of Title 42 United States Code, Section 1320a-7b(b)(2)(A), the anti-kickback act.

91.   The above allegations are supported by witness statements, recorded statements, evidence obtained through the execution of search warrants, and corroborating documentary evidence.

IV.   CONCLUSION

92.   Based on the evidence set forth herein, there is probable cause to believe SINGH, acting through and on behalf of her company, ADVENT, has engaged in paying kickback payments in exchange for the referral of Medicare patients for hospice services, in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b)(2)(A).

V.    REQUEST FOR SEALING

93.   Since this investigation is ongoing, disclosure of the Complaint, this affidavit, and/or this application and the attachments thereto will jeopardize the progress of the investigation.  Disclosure could result in the destruction of evidence, intimidation or collusion of witnesses, or the flight of a suspect.  Accordingly, I respectfully request the Court issue an

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

order directing this Affidavit and any related documents be sealed
until the further order of this Court.

_____
Katelyn McKendrick, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me
this ____ day of September, 2019.

_____
HON. JOSEPH C. SPERO
United States Chief Magistrate Judge